IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 16-cv-02732-RBJ-KLM

MATTHEW K. MOUNTS,

      Plaintiff,

v.

RICK RAEMISCH, Executive Director of CDOC,
ANGELA MEDINA, Warden of Canon Minimum Centers, and
RANDY OLGUIN, Lt., Volunteer Services Coordinator,

      Defendants.
_____

**RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE**
_____

**ENTERED BY MAGISTRATE JUDGE KRISTEN L. MIX**

      This matter is before the Court on Defendants' **Motion for Summary Judgment**

[#60][1] (the "Motion"). Plaintiff, who is proceeding pro se,[2] filed a Response [#63] in

opposition to the Motion, and Defendants filed a Reply [#70]. Pursuant to 28 U.S.C. § 636

(b)(1)(A) and D.C.COLO.LCivR 72.1(c), the Motion [#60] has been referred to the

undersigned for a recommendation regarding disposition. *See* [#61]. The Court has

reviewed the pleadings, the entire case file, and the applicable law, and is sufficiently

---

[1] "[#60]" is an example of the convention the Court uses to identify the docket number assigned to a specific paper by the Court's case management and electronic case filing system (CM/ECF). This convention is used throughout this Recommendation.

[2] The Court must construe liberally the filings of pro se litigants. *See Haines v. Kerner*, 404 U.S. 519, 520-21 (1972); *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). However, the Court should not be the pro se litigant's advocate, nor should the Court "supply additional factual allegations to round out [the pro se litigant's] complaint or construct a legal theory on [his] behalf.*" Whitney v. New Mexico*, 113 F.3d 1170, 1173-74 (10th Cir. 1997) (citing *Hall*, 935 F.2d at 1110). In addition, pro se litigants must follow the same procedural rules that govern other litigants. *Nielsen v. Price*, 17 F.3d 1276, 1277 (10th Cir. 1994).

advised in the premises. For the reasons set forth below, the Court respectfully **RECOMMENDS** that the Motion [#60] be **GRANTED in part and DENIED in part**.

## I. Summary of the Case[3]

Plaintiff is an inmate incarcerated by the Colorado Department of Corrections ("CDOC") at Arrowhead Correctional Center ("Arrowhead" or "ACC"). *Motion* [#60] at 2. On January 12, 2017, Plaintiff filed an Amended Complaint [#12] pursuant to 42 U.S.C. § 1983, asserting that Defendants violated his First and Fourteenth Amendment rights and the Religious Land Use and Institutionalized Persons Act ("RLUIPA")[4] by refusing to accommodate certain requests associated with his Jewish faith. In the section of the Amended Complaint titled "Request for Relief," Plaintiff states that he wants:

> All religious services to be allowed at the correct times (except during security emergencies, etc . . .), all religious practices to be allowed, all religious items to be allowed (books, clothing, ritual items, etc . . .), all religious items to be allowed to be worn at all times in all places within CDOC, on transports, etc . . . , all religious items to be ordered as needed, not when it is too late, $10,000 per incident/claim plus punitive damages: $10,000,000.00.

*Am. Compl.* [#12] at 9. Specifically, Plaintiff requests accommodation from Arrowhead relating to the lighting of candles for specific religious ceremonies on Friday and Saturday

---

[3] The Court construes the evidence in a light most favorable to Plaintiff as the nonmovant here. *Ellis v. J.R.'s Country Stores, Inc.*, 779 F.3d 1184, 1186 (10th Cir. 2015) ("We . . . recit[e] all summary-judgment evidence in the light most favorable to . . . the nonmovant.").

[4] In the Jurisdiction section of Plaintiff's Amended Complaint, Plaintiff also mentions the Eighth Amendment. *See* [#12] at 2. However, under the Nature of the Case and Cause of Action sections of his Amended Complaint, he does not further allude to the Eighth Amendment. *See id.* at 3-7. The Court also finds no obvious allegations in the Amended Complaint which would give rise to an Eighth Amendment claim. In addition, the current Response [#63] to the Motion [#60] only discusses the First Amendment, RLUIPA, and due process. Accordingly, the Court does not construe Plaintiff's Amended Complaint [#12] as asserting a claim under the Eighth Amendment and does not address it further in this Recommendation.

nights. *Motion* [#60] at 3; *Response* [#63] at 2. Additionally, Plaintiff requests (1) a gartel belt; (2) a dreidel; (3) access to challah bread; (4) a black hat or fedora; and (5) access to Tefillin in his cell.[5] *Motion* [#60] at 4-5; *Am. Compl.* [#12] at 6. Finally, the Court construes Plaintiff's Amended Complaint as asserting First and Fourteenth Amendment claims based on the denial of religious services for two months starting in May 2016. *Am. Compl.* [#12] at 7. The Court discusses the evidence underlying these requests in detail in the Analysis section below. In the present Motion [#60], Defendants seek summary judgment in their favor on all claims.

## II. Standard of Review

The purpose of a motion for summary judgment pursuant to Fed. R. Civ. P. 56 is to assess whether trial is necessary. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Under Fed. R. Civ. P. 56(c), summary judgment shall be granted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." An issue is genuine if the evidence is such that a reasonable jury could resolve the issue in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 277 U.S. 242, 248 (1986). A fact is material if it might affect the outcome of the case under the governing substantive law. *Id.*

The burden is on the movant to show the absence of a genuine issue of material fact. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670-71 (10th Cir. 1998) (citing *Celotex*,

---

[5] "Tefillin are leather boxes with attached leather straps containing passages from the Torah that are used in Jewish prayer." *Searles v. Bruce*, 216 F. App'x 812, 813 (10th Cir. 2007). Plaintiff describes Tefillin as "a 6 foot strap equat[ing] to a smaller version of the 10 foot coaxial cable, or the 15 foot paracord." *Response* [#63] at 6.

477 U.S. at 323). When the movant does not bear the ultimate burden of persuasion at trial, the "movant may make its prima facie demonstration [of the absence of a genuine issue of material fact] simply by pointing out to the court a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Id.* at 671. If the movant carries the initial burden of making a prima facie showing of a lack of evidence, the burden shifts to the nonmovant to put forth sufficient evidence for each essential element of his claim such that a reasonable jury could find in his favor. *See Anderson*, 277 U.S. at 248; *Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1326 (10th Cir. 1999). The nonmovant must go beyond the allegations and denials of his pleadings and provide admissible evidence, which the Court views in the light most favorable to him. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Panis v. Mission Hills Bank, N.A.*, 60 F.3d 1486, 1490 (10th Cir. 1995) (citing *Celotex*, 477 U.S. at 324). Conclusory statements based merely on conjecture, speculation, or subjective belief are not competent summary judgment evidence. *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004). The nonmoving party's evidence must be more than "mere reargument of [his] case or a denial of an opponent's allegation" or it will be disregarded. *See* 10B Charles Alan Wright et al., *Federal Practice and Procedure* § 2738 (4th ed. 2017).

When ruling on a motion for summary judgement, a court may consider only admissible evidence. *See Johnson v. Weld Cty., Colo.*, 594 F.3d 1202, 1209-10 (10th Cir. 2010). The factual record and reasonable inferences therefrom are viewed in the light most favorable to the party opposing summary judgment. *Concrete Works, Inc., v. City & Cty. of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994). At the summary judgment stage of litigation, a plaintiff's version of the facts must find support in the record. *Thomson v. Salt*

*Lake Cty.*, 584 F.3d 1304, 1312 (10th Cir. 2009). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Thomson*, 584 F.3d at 1312.

Only documents that meet the evidentiary requirements of Fed. R. Civ. P. 56 may be considered for purposes of summary judgment. Rule 56(c) provides that:

> (1) A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials[.]
>> . . .
> (3) Materials Not Cited. The court need consider only the cited materials, but it may consider other materials in the record.
> (4) Affidavits or Declarations. An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

Fed. R. Civ. P. 56(c)(1)-(4).

## III. Analysis

### A. Preliminary Issues

#### 1. Plaintiff's Evidence

Plaintiff notes in his Response (1) that he has not received all of the discovery he requested, (2) that he was forced to mail out the CD of evidence that Defendants sent him, so he is unable to provide all evidence he wanted to present in opposition to the present Motion [#60], and (3) that he has not received a ruling on his objection to the format of the discovery he did receive. *See* [#63] at 6. The discovery deadline was July 31, 2018. *See*

[#43].  The present Response [#63] was filed on November 5, 2018.  While Plaintiff does not directly ask for relief on any of these bases in the Response [#63], the Court briefly addresses these statements.

At the outset, the Court notes that none of these issues have properly been brought to the Court's attention.  The Court has informed Plaintiff three times: "If you want the Judge to do something in your case, you must file a motion asking the Judge to do it and explaining why you want it done.  The Judge does not respond to letters or any other form of request except motions."  *See* [#41-2] (in writing as an attachment to Minute Order setting the Scheduling Conference); [#43] (orally at the Scheduling Conference); [#43-1] (in writing as an attachment to the Minutes from the Scheduling Conference).  Regardless, Plaintiff has failed to file motions on any of these issues.

Regarding Plaintiff's statement that he has not received all of the discovery he requested, on July 12, 2018, Plaintiff filed a Response to the Defendants' Objections [#51], which seems to be connected to a first set of written discovery requests from Plaintiff.  Nothing in the title or on the first page provides any indication that Plaintiff sought any relief from the Court.  It is not until the last page that Plaintiff states that he would like the Court to "review the objections and realize there is no confidentiality in 'work place emails, phone calls or conversations' and instruct" Defendants "to comply with the [d]ocument requests."  Even if Plaintiff had appropriately brought this issue to the Court's attention through, for example, a motion to compel, neither the discovery requests nor Defendant's response/objections to the discovery requests have been entered on the electronic docket in this case, and therefore the Court would have been, and continues to be, unable to adjudicate any issue Plaintiff may have had with Defendants' discovery responses.

Regarding Plaintiff's statement that he has not received a ruling on his objection to the format of the discovery he did receive, on August 6, 2018, he filed an Objection to Usability of Discovery Documents [#54], which seems to have been directed at Defendants' responses to Plaintiff's Second Request for Discovery [#50]. On August 13, 2018, Plaintiff filed an Update of Objection as to Format of Discovery [#55], and on September 12, 2018, he filed an untitled Letter [#58]. Again, this issue was also not appropriately brought to the Court's attention through the procedures discussed above. However, to address the merits of this issue now, the Court notes that CDOC Administrative Regulation ("AR") 750-03(III)(M)(4)(b) requires legal materials of more than 1000 pages sent from an attorney to be transmitted on electronic media. The CD at issue had approximately 3300 pages of material on it. *See* [#55] at 1. Plaintiff states that Defendants could have sent him these materials in hard copy in four separate batches of approximately 825 pages each. *Id.*; *see also* [#54] at 2. While this technically may have been possible (a point on which the Court makes no finding), the Court is aware of no requirement that Defendants provide discovery in this manner, and further notes that "[v]oluminous documents which will cause the offender to exceed his/her legal box maximum may be held by the facility until the offender brings the legal box into compliance to enable receipt of the newly received documents." AR 750-03(III)(M)(4)(b). Thus, it seems unlikely that Plaintiff's plan to have full access to all of the documents provided in discovery at one time would have been permitted by the facility regulations even had Defendants provided the documents in hard copy format in multiple batches.

Finally, the Court addresses Plaintiff's statement that he had to mail out the CD that was provided to him by Defendants, and that he therefore "is unable to provide all of what

he wanted to present" in his Response [#63].  CDOC AR 750-03(III)(M)(3) provides that legal materials on electronic media shall be "available for review in the facility law library for a period of 50 days from the date of notice that the materials are available."  After that time has expired, the inmate has ten days to notify the facility legal assistant of where the CD can be sent outside of the facility, or else it is destroyed.  AR 750-03(III)(M)(8)(a).  Given the amount of time most civil lawsuits take to reach completion, the Court notes that the fifty-day period for review and use of discovery located on electronic media may be inadequate.  However, importantly, "[e]xceptions and/or extensions of the viewing period may be made on a case by case basis and must be in writing."  AR 750-03(III)(M)(3).  There is no indication that Plaintiff attempted to take advantage of this provision by seeking an extension of time for the viewing period, although he was directly informed of the process when he first received access to the CD on August 8, 2018.  *See* [#55] at 3 ("Law Library Memo to Offender re: Legal CD Materials for Review").

The Court notes that Plaintiff is not without any evidence to rebut Defendants' Motion [#60].  First, Plaintiff attached three exhibits to his Response to the Motion.  *See* [#63] at 9-17.  Second, pursuant to 28 U.S.C. § 1746, Plaintiff swore to his Amended Complaint [#12] under penalty of perjury, and thus this document may be treated as an affidavit and used as evidence on a motion for summary judgment.[6]  *See Pacheco v. Timme*, No. 11-cv-02530-RM-KLM, 2014 WL 2442111, at *4 n.2 (D. Colo. May 30, 2014).  Third, Plaintiff previously submitted to the Court sworn responses to Defendants' interrogatory requests.  *See* [#49].  The Court notes that there is no stated reason why Plaintiff could not

_____

[6]  The Court notes that this is not true for his Response [#63] to the present Motion [#60].

-8-

have submitted his own declaration or affidavit in opposition to the present Motion [#60].

However, the evidence that Plaintiff offers in opposition to summary judgment must provide more than conclusory or vague statements in order to create a genuine issue of material fact with respect to Defendants' otherwise undisputed facts. *See Ford v. West*, 222 F.3d 767, 777 (10th Cir. 2000) ("Vague, conclusory statements do not suffice to create a genuine issue of material fact."); *Branson v. Price River Coal Co.*, 853 F.2d 768, 772 (10th Cir. 1988) (stating that "mere conjecture" is an insufficient basis for denial of summary judgment). The Court therefore does not make reference to such statements, even if Plaintiff "disagrees" with Defendants' facts, unless Plaintiff directs the Court's attention to evidence in the record which otherwise supports his "disagreements." Finally, the Court also notes that it disregards all statements consisting of legal conclusions. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### 2.     Fourteenth Amendment

Although not explicit, it appears that Plaintiff is also asserting a Fourteenth Amendment due process claim in connection with the decision to ban him for two months from religious services. *See Am. Compl.* [#12] at 7. Plaintiff mentions the Fourteenth Amendment under the jurisdictional section of his Amended Complaint. *Id.* at 2. He then states under his fourth claim: "In May 2016 Lt. Olguin denied the plaintiff [any] services for two months in violation of CDOC Administrative Regulation (AR 150-01) as well as in violation of the plaintiffs [sic] rights." *Id.* at 7. AR 150-01 provides CDOC's Code of Penal Discipline for inmates.

In the present Motion, Defendants appear to recognize this claim in a heading: "The CDOC's denial of remaining provisions do not constitute violations of the First Amendment,

RLUIPA, or the Fourteenth Amendment." [#60] at 10. However, this appears to be the only mention of, or even allusion to, the Fourteenth Amendment or due process anywhere in the Motion. Instead, Defendants treat Plaintiff's claim here as only being asserted under the First Amendment and/or RLUIPA. *See id.* at 13-14, 16-17.

In his Response, Plaintiff provides argument regarding this issue and the First Amendment, but he also clearly notes his due process concerns:

> [T]here was no due process hearing he was in any way aware of for the punishment that was handed down to restrict him from services. The CDOC has specific rules laid out in AR 150-01 that state what punishments may be handed out for various behaviors, and there are no sanctions that include restricting someone from services for two months. Lt. Olguin's actions violated CDOC ARs and the plaintiff feels that he also violated his rights.

[#63] at 3. Thus, Plaintiff makes clear that his Fourteenth Amendment claim is asserted against Defendant Randy Olguin ("Olguin") and that the primary basis for the claim is an alleged denial of due process. However, in the Reply, Defendants again still interpret this claim as being asserted only under the First Amendment and/or RLUIPA. [#70] at 5-6.

Based on this background, the Court finds that Defendant Olguin has failed to provide adequate argument regarding the dismissal of Plaintiff's Fourteenth Amendment claim regarding the denial of religious services for two months. *See United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)) ("Judges are not like pigs, hunting for truffles buried in briefs."). In the absence of any argument to this effect, the Court finds that consideration of summary judgment on this issue to the extent asserted under the Fourteenth Amendment is inappropriate, *except* to the extent impacted by subject matter jurisdiction, which the Court may raise at any time, as discussed below.

**B.     Subject Matter Jurisdiction**

Defendants raise Eleventh Amendment immunity and mootness arguments in the context of their summary judgment discussion, thus essentially seeking rulings on whether the Court has subject matter jurisdiction over portions of this action. *Motion* [#60] at 8-10. The Court therefore discusses these arguments first. *See Herrara v. Alliant Specialty Ins. Servs., Inc.*, No. 11-cv-00050-REB-CBS, 2012 WL 959405, at *3 (D. Colo. Mar. 21, 2012) (stating that issues of subject matter jurisdiction "must be resolved before the court may address other issues presented in the motion").

### 1. Eleventh Amendment Immunity

The Eleventh Amendment provides that "[t]he Judicial Power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State or Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. Courts interpret the Eleventh Amendment to prohibit a citizen from filing suit against a state in federal court. *Ruiz v. McDonnell*, 299 F.3d 1173, 1180 (10th Cir. 2002). A claim against a public official acting in his official capacity is treated like a claim against the state and is barred by the Eleventh Amendment. *Kentucky v. Graham*, 473 U.S. 159, 169 (1985). To the extent Plaintiff seeks money damages against Defendants in their official capacities under the First and Fourteenth Amendments and RLUIPA, they are immune from such damages claims under the Eleventh Amendment. *Id. See, e.g.*, *Wauford v. Richardson*, 450 F. App'x 698, 699 (10th Cir. 2011); *Sossamon v. Texas*, 563 U.S. 277, 293 (2011) (holding that the Eleventh Amendment applies to RLUIPA claims).

Accordingly, the Court **recommends** that Plaintiff's First and Fourteenth

Amendments and RLUIPA claims against Defendants in their official capacities be **dismissed without prejudice** to the extent Plaintiff seeks money damages. *See Wauford*, 450 F. App'x at 699 (stating that claims barred by the Eleventh Amendment should be dismissed without prejudice); *Shikles v. Sprint/United Mgmt. Co.*, 426 F.3d 1304, 1317-18 (10th Cir. 2005) (holding that the district court should have ordered dismissal, rather than summary judgment, when jurisdiction was lacking).

### 2. Mootness

Defendants argue that several of Plaintiff's requests for injunctive relief are moot because Arrowhead has determined that the facility will accommodate them. *Motion* [#60] at 10. Specifically, Defendants assert that Arrowhead will accommodate Plaintiff's request to light candles at appropriate times and will allow him possession of a gartel and access to a dreidel during program time. *Id.* Plaintiff responds that he is not being allowed to light his wax candles at appropriate service times. *Response* [#63] at 3-4. Plaintiff also objects to Defendants' gartel accommodation, stating that he has only been "given an approximately 15 foot long piece of [p]aracord." *Id.* at 2. Plaintiff does not contest that Defendants have accommodated his request for access to a dreidel. *Id.* at 2.

Mootness is an issue of subject matter jurisdiction, which can be raised at any stage of the proceedings. *Kennedy v. Lubar*, 273 F.3d 1293, 1301-02 (10th Cir. 2001). "Article III's requirement that federal courts adjudicate only cases and controversies necessitates that courts decline to exercise jurisdiction where the award of any requested relief would be moot—i.e. where the controversy is no longer live and ongoing." *Front Range Equine Rescue v. Vilsack*, 782 F.3d 565, 568 (10th Cir. 2015) (internal quotation marks omitted).

"A case is moot . . . where the relief sought can no longer be given or is no longer needed."

*Id.* (internal quotation marks omitted).

"But even if a case is not constitutionally moot, it may be prudentially moot."
*Robertson v. Biby*, 719 F. App'x 802, 804 (10th Cir. Dec. 15, 2017). In *Winzler v. Toyota Motor Sales U.S.A., Inc.*, 681 F.3d 1208, 1210-11 (10th Cir. 2012), the Tenth Circuit Court of Appeals laid out in detail the circumstances under which a case may be deemed prudentially moot:

> [C]laims for equitable relief, like the injunction [the plaintiff] seeks in this lawsuit, appeal to the remedial discretion of the courts. This remedial discretion necessarily includes the power to mould each decree to the necessities of the particular case. And inhering in that power is the concomitant power to deny relief altogether unless the moving party [can] satisfy the court that relief is needed. After all, if events so overtake a lawsuit that the anticipated benefits of a remedial decree no longer justify the trouble of deciding the case on the merits, equity may demand not decision but dismissal. When it does, we will hold the case "prudentially moot." Even though a flicker of life may be left in it, even though it may still qualify as an Article III "case or controversy," a case can reach the point where prolonging the litigation any longer would itself be inequitable.
>
> Prudential mootness doctrine often makes its appearance in cases where a plaintiff starts off with a vital complaint but then a coordinate branch of government steps in to promise the relief [ ]he seeks. Sometimes the plaintiff will seek an injunction against the enforcement of a regulation the relevant agency later offers to withdraw on its own. Sometimes the plaintiff will seek an order forcing a department to take an action that it eventually agrees to take voluntarily. However it comes about though, once the plaintiff has a remedial promise from a coordinate branch in hand, we will generally decline to add the promise of a judicial remedy to the heap. While deciding the lawsuit might once have had practical importance, given the assurances of relief from some other department of government it doesn't any longer.
>
> To be sure, promises of reform or remedy aren't often sufficient to render a case moot as a constitutional matter. That's because the risk always exists that, as soon the court turns its back, the defendant might renounce his promise and "return to his old ways." But even when the risk of recalcitrance is injury enough to keep the case alive as an Article III matter, it isn't necessarily enough to avoid the application of [the] prudential mootness

doctrine.  That's because any party invoking the equitable remedial powers of the federal courts must still satisfy the court that requested relief is needed, and when it comes to assessing that question, a remedial promise always qualifies as one of the factors to be considered.  Though a remedial promise may not be enough to kill a case constitutionally, it can be enough to bring it to an end all the same as a matter of equity.

The weight a remedial promise plays in the equitable calculus depends, of course, on who is making the promise and the reliability of that party's past promises. . . .  [W]e take governmental promises seriously . . . because they are generally trustworthy.  We also take them seriously because affording a judicial remedy on top of one already promised by a coordinate branch risks needless inter-branch disputes over the execution of the remedial process and the duplicative expenditure of finite public resources.  It risks, too, the entirely unwanted consequence of discouraging other branches from seeking to resolve disputes pending in court.

(citations and some internal quotation marks and brackets omitted).

Based on the following, the Court finds that the candle-lighting service times issue is prudentially moot, that the electric-versus-wax candles issue is not moot, and that the dreidel and gartel issues are constitutionally moot.

### a.    Candles

The issues surrounding candle-lighting are more nuanced than are the other issues raised by Plaintiff.  Defendants assert that "[i]n response to Plaintiff's complaints the officials in charge of faith-based programs and Arrowhead determined that they would accommodate Plaintiff's requests to light candles at different times throughout the year, despite the facility's regular practice of closing programs at 7:30 p.m." *Motion* [#60] at 10.

In the Amended Complaint, dated January 9, 2017, Plaintiff stated that "[t]he Friday night candle lighting times range from 4:18pm in December through 8:10pm in June." *See* [#12] at 4.  He further stated that "[t]his means through this facilities [sic] scheduling, (which is [that] Jewish services are only held from 5:30pm to 7:30pm Friday and Saturday year

round) most of the time I am denied correct service times." *Id.* Over a year later, on June 1, 2018, Plaintiff stated that "[s]wing shift was allowing me to light at the correct times last year until daylight savings made the after 8 pm time unnecessary. Now that we are back into normal time (as of March) I haven't been able to get that set back up." *Pl.'s Interrogatory Response* [#49] at 5. However, he noted that he "spoke with Lt. Olguin about this at the Warden's Meeting 5/8/2018 and he said he would speak with Lt. Green, but it may take time." *Id.* Importantly, the Court observes Plaintiff's statement that he "has not ever requested the candle lightings he's asking for during a [c]ount. He specifically has tried to either light early on Fridays where the correct time is during count (and the correct times are from 4:15pm thru 5:25pm from Nov thru February) or later on Saturday which does raise the issue during the majority of the year because programs close at 7:30pm and the candle lightings from April through September are after that time." *Response* [#63] at 2. Thus, the Court emphasizes that Plaintiff is not seeking to have candle-lighting service times during count, i.e., when every inmate is expected to be in his cell to be counted in order to make sure that no one is missing.

In support of their mootness argument, Defendants point to the October 15, 2018 Declaration of Olguin [#60-3]. *Id.* Defendant Olguin is a Facility Volunteer Coordinator for CDOC, whose job entails working with CDOC "headquarters to ensure volunteer programs are conducted safely and consistently with policy," including "acting as a point of contact for offenders who have specific requests relating to faith-based practices." *Decl. of Olguin* [#60-3] ¶¶ 1, 3. Defendant Olguin states, in relevant part:

> With respect to Mr. Mounts' requests for specific candle-lighting accommodations, the facility has been accommodating Mr. Mounts. However, he is responsible for alerting staff to the changing schedule of his

ceremonies. Because Mr. Mounts[ ] is requesting to light candles at various times based on sunset, he does not need accommodation year-round. At some point in 2017 Mr. Mounts stopped asking for accommodations because he could light candles within the facility's normal schedule. Mr. Mounts claimed he was denied accommodations in 2018. I spoke with staff, including Lieutenant Green, who explained Mr. Mounts stopped asking for accommodations in 2017. He did not speak with Lieutenant Green to resume accommodations in 2018. I speak with Mr. Mounts regularly and he never mentioned anything to me about not being accommodated to ensure proper lighting times.

Arrowhead conducts a count time at 8:00 p.m. This count requires all offenders to be in their living unit. To ensure offender movement completes in time for count, the facility closes programs at 7:30 p.m. For a portion of the year, Mr. Mounts requests to light a candle after 7:30 p.m.

Mr. Mounts must communicate with staff to ensure the facility is aware of when Mr. Mounts needs accommodations to light candles outside of normal program times. Accommodating Mr. Mounts requires a staff member to accompany him to the programs area after all programs are closed.

*Id.* ¶¶ 18-20.

Defendants also point to the October 12, 2018 Declaration of Kirk Machin ("Machin") [#60-5]. *Motion* [#60] at 10. Mr. Machin is the Faith and Citizen Programs Coordinator for CDOC and is the consultant for regional and local Facility Volunteer Coordinators such as Defendant Olguin. *Decl. of Machin* [#60-5] ¶¶ 1, 3. His primary duties include overseeing "all volunteers for the DOC [and] all offender faith-based policies and practices," working "as a liaison with Facility Volunteer Coordinators to receive and process religious requests," providing "consistency across DOC facilities with regard to policy and practice," and submitting "recommendations to the executive staff regarding policy changes affecting faith-based programs." *Id.* ¶ 4. As relevant here, Mr. Machin states:

Mr. Mounts' request to light a candle could be accommodated to an extent. It is not always possible to allow Mr. Mounts to leave the living unit, when the rest of the facility is required to be in their living units. Generally, he is being allowed to light a candle in the programs building, after the standing count at

8:00 p.m., when the facility has sufficient staffing to cover Mr. Mounts' movement throughout the facility without jeopardizing security. The facility cannot always allow Mr. Mounts to burn a real candle at the necessary time, for example if a lockdown occurs after a violent or dangerous incident, but he also has tea lights which are commonly used in lieu of wax candles.

*Decl. of Machin* [#60-5] ¶ 13.

Finally, Defendants direct the Court's attention to the October 12, 2018 Declaration of Kenneth Green ("Green") [#60-6]. *Motion* [#60] at 10. Mr. Green is a Lieutenant at Arrowhead, where he has worked since 1997. *Decl. of Green* [#60-6] ¶ 2. He states:

I [r]eceived direction from Major Hector Huertas and Captain Lance Johnson to make a specific accommodation for offender Matthew Mounts (IM# 66276). I was told to arrange for a security officer to accompany Mr. Mounts to the program area, as needed, to allow Mr. Mounts to light a candle for religious services after programs shut down, which is at 7:30 p.m. in all facilities at the Cañon Minimum Center.

I was directed to allow this to happen unless a security need prevented a security officer from accompanying Mr. Mounts. A security officer had to retrieve a lighter, give it to Mr. Mounts, and monitor his candle-lighting to ensure the facility was safe. Mr. Mounts could not be allowed to do this alone because of the security risk of allowing an offender to light an open flame without supervision.

To my knowledge, the candle-lighting was occurring without incident.

In June or July of 2018 Mr. Olguin spoke with me about the candle-lighting, and stated Mr. Mounts was claiming he was not allowed to light his candles at the appropriate times. This was news to me, because Mr. Mounts had not notified me of any problems with the candle-lighting process.

I spoke with staff members in the facility to determine what was going on. Mr. Mounts had not told any staff member that he needed accommodation to light his candles at the proper times. Because the Jewish calendar is based on the sun, the time for lighting candles varies throughout the year.

At some point after the facility started accommodating Mr. Mounts' need to light candles after programs closed, he no longer need accommodation. He was able to light his candles at the appropriate time because the sun was setting earlier in the day. For several months he did not need to be accommodated. At some point in the spring the 7:30 p.m. closing of

programs started to conflict with Mr. Mounts' candle-lighting.

I spoke with Mr. Mounts and asked him why he did not notify staff or me about the need for accommodation. I explained that he was required to work with staff to ensure the facility was aware of his need to light candles after 7:30 p.m. Mr. Mounts claimed to have submitted kites asking to speak with me. I explained to him that all he needed to do was talk with staff, and if there was any issue he should come speak with me.

I explained to Mr. Mounts that I could not help him unless he communicated with me or my staff. If Mr. Mounts ever missed appropriate candle-lighting times, after we began working with him, it was because he failed to communicate with staff.

*Id.* ¶¶ 3-10.

Based on this evidentiary background, the Court first addresses candle-lighting service times and then separately addresses the issue of battery-operated tea lights versus burning wax candles.

### i.    Candle-Lighting Service Times

With respect to the issue of timing of services, given the parties' evidence provided above, the Court finds that "there remains not enough value left for the courts to add in this case to warrant carrying on with the business of deciding its merits." *Winzler*, 681 F.3d at 1211. Arrowhead has "committed to ensure [Plaintiff] precisely the relief [ ]he seeks." *See id.* "At best, we might duplicate their efforts and waste finite public resources in the process. At worst, we might invite inter-branch confusion and turf battles over the details of carrying out an agreed objective." *Id.*

"Things might be different if we thought [Plaintiff] would be left without complete relief." *See id.* "While we generally hold a case moot when a coordinate branch steps in to resolve the problem, we don't do so without first accounting for the possibility of failure." *Id.* "If the party seeking relief can show that 'there exists some cognizable danger of

recurrent violation,' some cognizable danger that the coordinate branch will fail and [ ]he will be left without a complete remedy, we will continue with the case even in the face of a simultaneous remedial commitment from another branch." *Id.* at 1211-12 (citing *United States v. W.T. Grant*, 345 U.S. 629, 633 (1953)). "After all, while equity may not require us to duplicate efforts of the other branches it hardly insists we run the risk of leaving a plaintiff without a remedy [ ]he's entitled to." *Winzler*, 681 F.3d at 1212. "In seeking to avoid one set of wrongs (needless duplication and inter-branch disputes) we cannot ignore the possibility of inviting what may be even a greater one (leaving the plaintiff without a remedy in a meritorious case)." *Id.*

"To carry the burden of showing a 'cognizable danger' of failure, a plaintiff must point us to 'something more than the mere possibility' of failure." *Id.* (internal quotation marks omitted). "This doesn't require the plaintiff to prove an imminent or even a likely danger of failure." *Id.* "All [ ]he must show is a 'cognizable' danger—one perceptible or recognizable from the evidence before the court." *Id.* "At the same time, of course, it's not enough merely to speculate about or imagine how our coordinate branches might fail." *Id.* "A plaintiff must identify something more than the mere possibility of failure sufficient to 'keep the case alive' for Article III purposes." *Id.*

"Still, though this 'cognizable danger' standard poses a relatively modest hurdle, [Plaintiff's] . . . efforts to clear it clearly fall short." *Id.* Plaintiff denies the portion of Mr. Green's Declaration [#60-6] stating that "[f]acility staff at Arrowhead have been accommodating Plaintiff when he alerts them to his schedule, which varies throughout the year with the sunset" and that "he is able to light a candle when necessary for his religious practices." *Response* [#63] at 2. However, Plaintiff does not direct the Court's attention

to any evidence in support of his denial. Further, setting aside the issue regarding lack of evidence, Plaintiff's unsupported blanket denial is also lacking any detail that would allow the Court to rule in his favor. According to the various Declarations [#60-3, #60-6], the issues regarding timing of services appear to have been eliminated by about July 2018, at the latest. Since that time, by way of example only, Plaintiff has not provided dates on which he has not been accommodated, how many times he has not been accommodated, and whether and when he has alerted staff to the schedule of service times. Further, beyond his denial of Defendants' statement of fact, Plaintiff does not address in his Response the issue of service times.

"Of course . . . , if a plaintiff can show that the remedial mechanisms selected by a coordinate branch . . . present a cognizable, a perceptible, a recognizable danger [that] will lead our coordinate branch to fail to achieve its stated objectives, we can and will proceed with the case." *Winzler*, 681 F.3d at 1214-15. "But to justify the expenditure of judicial resources, all in duplication of ongoing efforts by a coordinate branch and in a fashion that necessarily evinces a judgment that those efforts are in some way defective, more than a speculative risk of failure is required." *Id.* at 1215. Here, Plaintiff's worries of continued and continual failure by Arrowhead officials are "backed by no evidence suggesting it is anything other than a hypothetical possibility, a conjectural but not cognizable danger." *Id.* He "offers no evidence that [Arrowhead] has abdicated its duties in the [time] . . . that has elapsed since" last summer. Even liberally construing the Response [#63], Plaintiff does not otherwise provide any argument in favor of why his claim regarding service times is not moot.

Thus, the Court finds that the portions of his First Amendment and RLUIPA claims

regarding the timing of candle-lighting services is prudentially moot to the extent Plaintiff seeks injunctive relief. Accordingly, the Court **recommends** that those portions of the claims be **dismissed without prejudice**. *See, e.g.*, *Lewis v. Burger King*, 398 F. App'x 323, 325 n.3 (10th Cir. 2010) (stating that dismissal due to mootness must be without prejudice); *Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1216-17 (10th Cir.2006) (recognizing established rule that "where the district court dismisses for lack of jurisdiction . . . , the dismissal must be without prejudice" because a court without jurisdiction lacks power "to make any determination of the merits of the underlying claim").

### ii.     Electric-Versus-Wax Candles

The Court's analysis regarding candles is not complete, however. The further issue with respect to candles is that Plaintiff is apparently sometimes faced with the choice of (1) lighting a wax candle at the incorrect time for services and (2) lighting a battery-operated tea light at the correct time for services. *See, e.g.*, *Am. Compl.* [#12] at 5 ("The fact that these services are at the wrong times is why the candles are denied . . . . It's not that we canno[t] have them, nor that [Defendant Olguin] refuses to get them[;] the fact that we can not light them except for specific times, and the services are at the wrong times is what is causing us to be denied that part of the services. Lt. Olguin has stated that he was instructed we (inmates) must solely use these 'electric tea lights' if we expect to light the candles at the correct times."); *see also id.* (". . . I also fought for burning candles, as in true correct wax and/or oil. . . . CDOC is now saying they are of the opinion that using 'battery operated tea lights' will serve the same purpose for being able to do this at the correct time."). Thus, even if the issue of timing of services is moot, the issue about whether

electric tea lights are an adequate substitute for wax candles is not. Defendants' evidence underlying their mootness argument does not explicitly go to this issue, and the Court cannot find that the issue is moot. Accordingly, the Court **recommends** that the Motion [#60] be **denied** to the extent Defendants argue that this issue is moot.

### b.    Dreidel

Regarding Plaintiff's request for a dreidel, Defendants state that they "replaced a dreidel that was formerly in community property." *Motion* [#60] at 10. In support, Defendants again point to the Declaration of Machin [#60-5]. *Motion* [#60] at 10. As relevant here, Mr. Machin states:

> The facility also determined that Mr. Mounts' request for a dreidel would be granted. Rabbi Rosskamm explained that a dreidel is not necessary for Jewish ceremonies. However, the DOC determined that the dreidel had been allowed at one point, and was kept in community property to lower the risk that it is used for prohibited activities like gambling. The dreidel is kept in community property and may be accessed during programs.

*Id.* ¶ 15. Plaintiff does not dispute this and offers no argument that his request for a dreidel is not now moot. Thus, the Court finds that this portion of Plaintiff's First Amendment and RLUIPA claims are moot to the extent Plaintiff seeks injunctive relief.

Accordingly, the Court **recommends** that Plaintiff's First Amendment and RLUIPA claims be **dismissed without prejudice as moot** to the extent Plaintiff seeks injunctive relief relating to a dreidel. *See, e.g.*, *Lewis*, 398 F. App'x at 325 n.3; *Brereton*, 434 F.3d at 1216-17.

### c.    Gartel

Regarding Plaintiff's request for a gartel, Defendants state that they have "decided to allow him a gartel." *Motion* [#60] at 10. In support, Defendants again point to the

Declaration of Machin [#60-5]. *Id.* As relevant here, Mr. Machin states:

> With respect to the request for a gartel, the facility determined it would allow Mr. Mounts to have a gartel. This is the first request I am aware of for a gartel; it is [a] belt used for prayer. Rabbi Rosskam explained that any belt or string may be used, as the purpose is to represent a division between the higher and lower parts of the body. The DOC had to consider all apparent security risks relating to a gartel. The DOC determined that a basic string-type gartel would be allowed because it is similar to a shoestring, which is allowed. Although the gartel poses certain risks, the DOC believes it can monitor Mr. Mounts' gartel through its current property control policies.

*Decl. of Machin* [#60-5] ¶ 14.

Plaintiff responds that he "has been given an approximately 15 foot long piece of Paracord. This is not a proper gartel. A gartel has anywhere from 4 to 40 separate cords." *Response* [#63] at 2. However, Plaintiff provides no evidentiary support for his statements. In the Amended Complaint, Plaintiff merely described a "gartyl" as "a black sash/belt worn on Sabbath to separate our upper/intelligent selves from our lower base/animal drives." *See* [#12] at 6. Plaintiff's submission of passages from the Code of Jewish Law similarly provides no evidentiary support for his allegations about a proper gartel. *See Response* [#63] at 7 (citing *id.* at 10, 11).

In their Reply [#70], Defendants further provide the Declaration of Rabbi Yisroel Rosskamm ("Rosskamm") [#70-1]. As relevant here, Rabbi Rosskamm states:

> With respect to Mr. Mounts' request for a gartel, I advised the CDOC that a Gartel is a small garment worn as a separation between the higher and lower parts of the body. Many Orthodox Jews have the custom to rely on the belt that they are wearing, which suffices to meet this requirement. The Hasidic community does not follow this leniency and they wear a special garment, known as a Gartel, during prayers. I recommended the CDOC allow inmates to have a Gartel, so that the inmates that associate with the Hasidic community can fulfill this obligation in accordance with their custom. Note: In Jewish law a custom that was implemented with a legitimate founding has rules as a vow and not fulfilling it may be equivalent to transgressing a vow.

*Decl. of Rosskamm* [#70-1] ¶ 7.

Given the uncontroverted evidence that CDOC now permits Plaintiff the use of a gartel, given the lack of argument that CDOC fails to allow Plaintiff to use this gartel appropriately, and given the complete lack of evidence that the gartel is not proper, as Plaintiff conclusorily states, the Court finds that this portion of Plaintiff's First Amendment and RLUIPA claims is moot to the extent he seeks injunctive relief.

Accordingly, the Court **recommends** that Plaintiff's First Amendment and RLUIPA claims be **dismissed without prejudice as moot** to the extent he seeks injunctive relief relating to a gartel. *See, e.g.*, *Lewis*, 398 F. App'x at 325 n.3; *Brereton*, 434 F.3d at 1216-17.

## C.    **Exhaustion of Administrative Remedies**

The Court next turns to Defendants' arguments concerning exhaustion of administrative remedies with respect to the request for challah bread. *Motion* [#60] at 14-15. Exhaustion is mandatory, and the issue of administrative exhaustion under the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), must be considered before examining the merits of a plaintiff's claims. *See Norton v. City of Marietta, OK*, 432 F.3d 1145, 1149-50 (10th Cir. 2005).

The PLRA provides as follows:

No action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a). The exhaustion requirement "applies to all prisoners seeking redress for prison circumstances or occurrences." *Porter v. Nussle*, 534 U.S. 516, 520

(2002). "There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." *Jones v. Bock*, 549 U.S. 199, 211 (2007) (citation omitted); *Woodford v. Ngo*, 548 U.S. 81, 84 (2006) ("Exhaustion is no longer left to the discretion of the district court, but is mandatory.").

The burden is on Defendants to raise failure to exhaust administrative remedies as an affirmative defense in a motion for summary judgment, as they have done here. *Jones*, 549 U.S. at 216; *Motion* [#60] at 14-15. If the evidence produced by the parties shows that there are no genuine factual issues preventing a finding that the plaintiff did not properly exhaust his available administrative remedies, the claim must be dismissed without prejudice. *See Dawson v. Werholtz*, No. 07-3165, 2008 WL 1773866, at *1 n.1 (D. Kan. Apr. 16, 2008) (citing *Fields v. Okla. State Penitentiary*, 511 F.3d 1109, 1113 (10th Cir. 2007) (stating that dismissal of unexhausted claims on summary judgment should be without prejudice)).

Prison facilities are tasked with the responsibility of establishing administrative review procedures for addressing prisoner grievances. To satisfy the PLRA exhaustion requirement, a prisoner plaintiff "must 'complete the administrative review process in accordance with the applicable procedural rules' – rules that are defined not by the PLRA, but by the prison grievance process itself." *Jones*, 549 U.S. at 218 (quoting *Woodford*, 548 U.S. at 88). CDOC has adopted AR 850-04 [#60-9], which establishes a grievance process for inmates at CDOC facilities. *Motion* [#60] at 14. This process involves three steps. *AR 850-04* [#60-9]. At each step, an inmate must complete and submit a grievance form and then wait a period of time to receive a response from a CDOC official. *Id.* An inmate has not exhausted his administrative remedies until he has received a denial of his step three

grievance form.  *Id.* at 7 § (IV)(E)(3)(c)(4) ("Step 3 grievance responses shall be sent to the grievance coordinator where the offender is located so that the response may be served upon the offender.  The decision of the grievance officer is the final agency action.").

Defendants argue that, "[a]lthough Plaintiff has filed numerous grievances relating to religious and other complaints, he has not exhausted the administrative grievance process with respect to his claim that denial of challah bread is a violation of his right to practice religion.  Because he failed to exhaust this claim, he is barred from bringing it in this subsequent lawsuit."  *Motion* [#60] at 15.  In support, Defendants provide fifty-nine pages of Plaintiff's grievances and attachments to grievances as well as CDOC's responses to grievances to demonstrate that Plaintiff did not properly exhaust his administrative remedies regarding challah bread.  *Id.* at 6 (citing [#60-8]).

Plaintiff responds that he agrees that he has not properly exhausted his administrative remedies regarding challah bread; however, he "states that he had at times been placed on restriction for filing too many grievances and had been told that because the 'regional coordinator had turned it down, they did not have to be grieved.'"  *Response* [#63] at 3.  "Where prison officials prevent, thwart, or hinder a prisoner's efforts to avail himself of an administrative remedy, they render that remedy 'unavailable' and a court will excuse the prisoner's failure to exhaust."  *Little v. Jones*, 607 F.3d 1245, 1250 (10th Cir. 2010) (citation omitted); *see also Aquilar-Avellada v. Terrell*, 478 F.3d 1223, 1225 (10th Cir. 2007) (stating that district courts are "obligated to ensure that any defects in exhaustion were not procured from the action or inaction of prison officials" before dismissing a claim for failure to exhaust).  Because Defendants carried their burden of making a prima facie showing that Plaintiff failed to comply with his administrative remedy exhaustion

requirements, the burden is on Plaintiff to provide admissible evidence that Arrowhead officials prevented, thwarted, or hindered his ability to comply with those requirements. *See Anderson*, 277 U.S. at 248 (explaining that the burden shifts to the nonmovant after the summary judgment movant makes a prima facie showing); *Adickes*, 398 U.S. at 157 (stating that the nonmovant must go beyond the allegations and denials of his pleadings and provide admissible evidence).

Plaintiff provides no evidentiary support for his statements.[7] The conclusory assertions in Plaintiff's Response [#63] that he was not permitted to grieve the challah bread issue are not competent summary judgment evidence. *Bones*, 366 F.3d at 875; *Hall*, 935 F.2d at 1111. The Court of Appeals for the Tenth Circuit has clearly explained that an inmate plaintiff must put forth some evidence that prison officials interfered with his ability to properly exhaust his administrative remedies if he seeks to have his failure to exhaust excused. For example, in *Fields v. Oklahoma State Penitentiary*, the Court of Appeals stated: "[Plaintiff] claims only that he was hampered in exhausting his remedies, and proving that he had exhausted, because he was denied access to and storage space for his legal materials. But he gives no specifics; bald allegations cannot preclude summary judgment." 511 F.3d at 1112.

Accordingly, the Court concludes that Plaintiff failed to exhaust his administrative remedies regarding challah bread before filing this action, and that there is no genuine issue of material fact with regard to this issue. Accordingly, the Court **recommends** that the First Amendment and RLUIPA claims should be **dismissed without prejudice** to the

---

[7] Even if he had, though, the Court finds that such statements are too vague to show that he was prevented from grieving this issue by prison authorities.

extent they are based on the denial of challah bread.  *See Fields*, 511 F.3d at 1113 (stating

that dismissal of unexhausted claims on summary judgment should be without prejudice).

## D.    RLUIPA

RLUIPA claims may only be brought against individuals in their official capacities

and only for injunctive relief.  *See Sossamon*, 563 U.S. at 293 (permitting injunctive relief

only); *Stewart v. Beach*, 701 F.3d 1322, 1335 (10th Cir. 2012) ("[T]here is no cause of

action under RLUIPA for individual-capacity claims.").[8]  Thus, the Court examines Plaintiff's

claims for injunctive relief against Defendants in their official capacities regarding the

lighting of wax candles (as opposed to electric tea lights), the wearing of a fedora, and the

use of Tefillin.[9]

"RLUIPA is similar to the First Amendment, except it imposes a heavier burden on

institutions to justify the impingement."  *See Jenner v. Sokol*, No. 11-cv-01497-RBJ-KMT,

2012 WL 1319783, at *4 (D. Colo. Apr. 17, 2012).  "Under RLUIPA, '[n]o government shall

impose a substantial burden on the religious exercise of a person residing in or confined

to an institution' unless the government demonstrates that the burden furthers a compelling

governmental interest and it is the least restrictive means of furthering that interest."

---

[8]  Plaintiff does not appear to be explicitly seeking relief under RLUIPA for money damages or against Defendants in their individual capacities, but to the extent that his lawsuit can so be construed, the Court **recommends** that summary judgment enter in favor of Defendants.

[9]  The precise legal basis for Plaintiff's claim regarding the denial of religious services for two months is unclear.  To the extent that it may be asserted under RLUIPA, the Court **recommends** that summary judgment enter in favor of Defendants, because (1) there is no cause of action under RLUIPA for money damages, *see Stewart*, 701 F.3d at 1335; *Sossamon*, 563 U.S. at 293, and (2) Plaintiff does not appear to seek any injunctive relief in connection with this claim, given that the denial of religious services was for a finite period of two months.  The Court further addresses the claim regarding denial of religious services in connection with its First Amendment discussion below.

*Robertson v. McCullough*, 739 F. App'x 932, 936 (10th Cir. 2018) (quoting 42 U.S.C. § 2000cc-1). To succeed on a RLUIPA claim, the plaintiff must provide evidence showing that "he wishes to engage in (1) a religious exercise (2) motivated by a sincerely held belief," and that exercise "(3) is subject to a substantial burden imposed by the government." *Robertson*, 739 F. App'x at 936 (quoting *Abdulhaseeb v. Calbone*, 600 F.3d 1301, 1312 (10th Cir. 2010)).

A religious exercise is one that is "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." *Robertson*, 739 F. App'x at 936 (quoting *Kay v. Bemis*, 500 F.3d 1214, 1221 (quoting 42 U.S.C. § 2000cc-5(7)(A))). RLUIPA was enacted by Congress to remove frivolous, arbitrary barriers that "impede[d] institutionalized persons' religious exercise," but it "anticipated . . . that courts entertaining complaints under [RLUIPA] would accord due deference to the experience and expertise of prison and jail administrators." *Cutter v. Wilkinson*, 544 U.S. 709, 716-17 (2005), (internal quotation marks omitted).

The Court "must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003). To this end, the Court notes the well-established law that prison management functions should be left to broad discretion of prison administrators to enable them to manage prisons safely and effectively. *See, e.g.*, *Meachum v. Fano*, 427 U.S. 215 (1976). Accordingly, courts should interfere with the management of prisons only under exceptionally compelling circumstances. *Taylor v. Freeman*, 34 F.3d 266, 268-70 (4th Cir. 1994). Indeed, the Tenth Circuit has stated that

it "abhor[s] any situation or circumstances requiring the intervention of the federal courts in matters involving the administration, control and maintenance by the sovereign states of their penal systems. It is a delicate role assigned to the federal courts to display that restraint so necessary 'in the maintenance of proper federal-state relations.'" *Battle v. Anderson*, 564 F.2d 388, 392 (10th Cir. 1977) (citation omitted). As such, "sweeping intervention in the management of state prisons is rarely appropriate when exercising the equitable powers of the federal courts." *Taylor*, 34 F.3d at 269 (citations omitted).

### 1. Tefillin

Plaintiff concedes that inmates are allowed to own Tefillin, *Am. Compl.* [#12] at 6, which he describes as "a 6 foot strap equat[ing] to a smaller version of the 10 foot coaxial cable, or the 15 foot paracord." *Response* [#63] at 6. However, he complains that "the CDOC policy is they must be stored in the Office or control centers rather than with the inmates who own them" and that there have been unspecified "times I have not been allowed to get to them when needed for prayers." *Am. Compl.* [#12] at 6. Plaintiff also complains that when stored, the proper respect has not been shown to such items: "Most recently, they have been sitting in the Unit Office with a 'Dog Food Can opener' sitting on top of the plastic box they are stored in. (Our unit has the K-9 companion program and this new can opener has only recently arrived but that shows the lack of respect/disdain staff have for our religious property.)." *Id.*

Defendants argue that "Plaintiff cannot demonstrate that the . . . secure storage of his [T]efillin . . . substantially burden[s] his ability to practice Judaism." *Motion* [#60] at 12. Defendants further argue that "[r]estrictions on . . . [T]efillin kept in his cell are . . . related to security interests, including theft, risk of assault or coercion, and possible escape risks."

*Id.* at 12-13. In support of these arguments, Defendants first point to the Declaration of

Olguin. *Motion* [#60] at 5. In relevant part, Defendant Olguin states:

> Mr. Mounts has [T]efillin, which is kept in a secure location. He is able to get the [T]efillin from staff and use it for religious ceremonies. Tefillin creates a security risk because each [T]efillin contains two straps that are roughly six feet long. Mr. Mounts has two [T]efillin, so he has approximately twenty or more feet of strap that is a significant security risk, because it can be used as a weapon, it could assist in an escape attempt, or it could be used to conceal items. Each [T]efillin has a storage box that could conceal contraband and be used to transport dangerous items to the programs area. These are unique items that could be sought after by other offenders. Because of this the DOC keeps all [T]efillin in secure locations. Mr. Mounts' [T]efillin is stored in a bag, inside of two Tupperware containers. Rabbi Rosskamm advised this storage method would be an appropriate means of ensuring the [T]efillin remains pure.

*Decl. of Olguin* [#60-3] ¶ 22. Defendants further point to the Declaration of Machin [#60-5].

*Motion* [#60] at 5. In relevant part, Mr. Machin states:

> . . . Mr. Mounts' request to keep [T]efillin in his cell cannot be accommodated. Tefillin creates a security risk and cannot be allowed in an offender's cell because it consists of two six-foot lengths of leather strap, which can readily be used as an escape device. Mr. Mounts is able to retrieve his [T]efillin from its secure location. Mr. Mounts' insistence on keeping [T]efillin in his cell is made more problematic by his request to keep a gartel. Allowing offenders to keep lengths of cord, fabric, or other string materials creates a risk of ligature weapons and escape tools, so the DOC needs to limit the number of items like this an offender can keep in their cell. This item is allowed across the DOC, and is only allowable because it is kept in the control center. Tefillin could easily be used to hold an offender's weight for purposes of climbing or repelling. Even if Mr. Mounts has no intent to escape, his possession of such a device creates a risk of theft by others, and it must be kept in a secure location.

*Decl. of Machin* [#60-5] at 19.

Not "every infringement on a religious exercise will constitute a substantial burden."

*Abdulhaseeb*, 600 F.3d at 1316. "[A] burden on religious exercise is 'substantial' under

RLUIPA if it denies a plaintiff 'reasonable opportunities' to engage in a religious exercise."

*Caruso v. Zenon*, No. 95-MK-1578, 2005 WL 5957978, at *17 (D. Colo. July 25, 2005).  An

"inconvenient" burden becomes a "substantial" burden

> when a government (1) requires participation in an activity prohibited by a sincerely held religious belief, or (2) prevents participation in conduct motivated by a sincerely held religious belief, or (3) places substantial pressure on an adherent either not to engage in conduct motivated by a sincerely held religious belief or to engage in conduct contrary to a sincerely held religious belief, such as where the government presents the plaintiff with a Hobson's choice—an illusory choice where the only realistically possible course of action trenches on an adherent's sincerely held religious belief.

*Abdulhaseeb*, 600 F.3d at 1315.

The Court finds that Plaintiff has not presented evidence sufficient to meet this standard.  While Plaintiff may be inconvenienced by having to retrieve the [T]efillin from the Unit Office or control center, "he has not demonstrated that this inconvenience is actually a substantial burden on his religious liberty."  *See Jenner*, 2012 WL 1319783, at *4.  While he mentions that "[t]here have been times I have not been allowed to get to them when needed for prayers," *Am. Compl.* [#12] at 6, there is no evidence to demonstrate a substantial burden here, such as, for example, how often and under what circumstances this situation has occurred.  In addition, although Plaintiff is concerned with the asserted mistreatment of his religious item by staff (such as placement in a box under a dog-food can opener), this issue is not the type of substantial burden contemplated by RLUIPA.[10] *See Abdulhaseeb*, 600 F.3d at 1315.

Accordingly, the Court **recommends** that summary judgment enter in favor of Defendants in their official capacities on the portion of Plaintiff's RLUIPA claim regarding

---

[10]  Although the Court does not make any finding regarding whether Plaintiff's Tefillin was actually mishandled, the Court urges Defendants to take greater care in the handling of religious items to lower the risk that these types of issues will arise in federal lawsuits in the future.

[T]efillin.

## 2. Fedora

Plaintiff states that a fedora is "a typical hat worn over the Yarmulke to show unity of the Hasidim." *Am. Compl.* [#12] at 6. He further states that this item was "turned down by the Regional religious coordinator and the reason was usually [that] AR 800-01, a policy signed off by the executive Director (Raemisch), does not list th[is] item[ ] as for religious use/authorized personal religious property." *Id.*

Defendants argue that "[t]o the extent Plaintiff would *prefer* to wear a particular black hat . . . , the facility is not substantially burdening his religion by denying him preferences, because he is still able to practice his religion in many other ways." *Motion* [#60] at 12. They further argue that "[a]llowing an offender to possess and display unique items [like a special black hat] creates risks of prison violence and theft" and "poses a risk that the hat might be used to circumvent CDOC policies, like concealing contraband." *Id.* at 11. In support of these arguments, Defendants point to the Declaration of Machin [#60-5]. *Motion* [#60] at 5. In relevant part, Mr. Machin states:

> Mr. Mounts' request for a black hat, or fedora, also cannot be accommodated. Allowing Mr. Mounts, and others, to wear a unique black hat creates a substantial security risk. The DOC is committed to keeping all of its offenders safe from threats, intimidation, abuse, and other forms of harassment by fellow offenders. Personal clothing and accessories are limited due to perceived identifiers (gang affiliation or religious affiliation) that have been shown to cause other offenders to harass or assault the individual. Mr. Mounts' request to wear a black hat because he is getting deeper into his faith is simply too problematic for security.

*Decl. of Machin* [#60-5] ¶ 18.

Defendants also direct the Court's attention to the Declaration of Travis Trani ("Trani") [#60-2]. *Motion* [#60] at 5. Mr. Trani has worked for CDOC since April 1994,

working his way through a variety of positions from "Correctional Officer I" to his current position of Director of Prisons, which he has held since December 2016. *Decl. of Trani* [#602-] ¶ 3. As Director of Prisons, he is "responsible for the overall management of Prison Operations which includes: 20 state prisons, 3 private prisons, Central Transportation Unit, Office of Emergency Management, Faith & Citizen Programs, Offender Services, and Time and Release Operations." *Id.* ¶ 4. As relevant here, Mr. Trani provides a lengthy exposition in his Declaration regarding uniforms in prison:

> The DOC requires that all offenders wear uniforms. There is a very strong penological interest behind the requirement that offenders wear uniforms.

> On a basic level, staff need to be able to quickly identify offenders. Most correctional staff wear uniforms, but some staff wear citizen clothing. The DOC also works with numerous volunteers across all facilities. These individuals generally come into the facility wearing citizen clothing and intermingle with offenders. Offender uniforms are very helpful in quickly distinguishing offenders from staff and volunteers.

> Specific to Mr. Mounts' requests, regardless of whether Mr. Mounts has experienced any aggression in the past because of his religion, allowing him to wear a fedora or other religious items in plain sight, creates a real security risk.

> Uniformity of uniforms is very important for prison security. Even slight variations in the uniform create security risks, and I am aware of several examples of violence or theft motivated by allowing offenders to have unique items.

> In prison it is very important to avoid anything that might create a hierarchy between inmates. Jealousy is a significant problem that can lead to violent conflict between offenders. Even the perception that an offender is receiving special treatment can make them a target for things like coercion, extortion, theft, or abuse. Reporting another offender is stigmatized. Many incidents between offenders will never come to the attention of DOC staff because of the risk involved in reporting another offender.

> One of [the] ways DOC tries to prevent jealousy is by avoiding any appearance of preferential treatment or unique privileges among offenders. The DOC works diligently to treat offenders equally to avoid jealousy, or the

appearance that an offender is being treated preferentially. Despite the DOC's efforts, offenders are constantly thinking of ways to differentiate themselves from others.

Because religion may provide opportunities to receive special consideration like leaving work early, receiving special meals, gathering as groups, and possessing unique items, some offenders attempt to use religion as a way of differentiating themselves from other offenders.

Regardless of the religious purpose of an item, allowing an offender to wear something special or maintain unique items poses a substantial risk of violence.

The DOC previously allowed offenders to wear glasses that were sent into the facility by family. This created a distinction between "the haves and have-nots". The DOC discontinued this practice because several offenders were assaulted, their glasses were stolen or broken, and it became clear that offenders with eyeglasses from the outside were targeted because they had unique glasses.

A similar problem arose when the DOC allowed offenders to wear wedding bands received from outside the facility. Offenders with unique wedding bands became targets, both for assault and theft.

These unique items also created a perception about some inmates, that they had family or friends with money, which creates a risk of extortion. The DOC is careful to prohibit things associated with [ex]tortion – for example, an offender's family member may not deposit money into another offender's account – but offenders being intimidated by other offenders are often too afraid to say anything about it. As a result, unique items, even religious items, must be carefully monitored, and are prohibited from being displayed openly.

An example of this is weight-lifting gloves. Offenders may purchase them from the canteen, but cannot wear them unless they are in the recreation area.

The DOC previously allowed offenders to wear different types of sneakers. Eventually it became clear that offenders were using specific types of sneakers to identify themselves as belonging to a particular group; usually a security threat group or "gang". The different types of sneakers became a real security threat and the DOC had to standardize footwear. Now, all offenders have the same boots unless they have a medical provision for sneakers. All of the sneakers are the same, so the only variation between footwear is based on an offender's medical need.

Throughout my career I have worked at several DOC facilities and have been involved in numerous discussions about assaults, thefts, extortion, or other security concerns caused by offenders having unique items.

Offenders even manipulate their standard uniforms to create differentiation. An example is the placement of a handkerchief or gloves; an offender may place something in their back pocket and specifically place it on the right side or the left side to demonstrate the group they belong to.

I have also witnessed gangs members use religious affiliation to identify gang affiliation, for example, some white supremacist gangs will practice and identify their gang affiliation through the Asatru religion. If we allow identifiable religious items to be worn in common areas of the facilities, we run the risk of allowing gang members to openly identify themselves as a gang member, which can create tension amongst rival gangs or intimidate non-gang affiliated offenders.

*Decl. of Trani* [#60-2] ¶¶ 13-28.

First, the Court finds that the denial of Plaintiff's request for a fedora falls squarely into the second category of "substantial" burdens on an inmate's religion, i.e., when the government "prevents participation in conduct motivated by a sincerely held religious belief." *Abdulhaseeb*, 600 F.3d at 1315. Here, Plaintiff is prevented from obtaining and wearing a fedora, which is conduct that is undisputed to be motivated by his sincerely held religious belief.

Second, RLUIPA requires the government to demonstrate that application of the burden on the inmate "is in furtherance of a compelling governmental interest," 42 U.S.C. § 2000cc-1(a)(1). The "compelling interest test cannot 'be satisfied by the government's bare say-so.'" *Ghailani v. Sessions*, 859 F.3d 1295, 1306 (quoting *Yellowbear v. Lampert*, 741 F.3d 48, 59 (10th Cir. 2014)). "Instead, the government must present evidence that imposing a substantial burden on an inmate's sincerely held religious beliefs serves a compelling government interest . . . ." *Reed v. Bryant*, 719 F. App'x 771, 779 (10th Cir.

2017) (citing *Abdulhaseeb*, 600 F.3d at 1318-19).

Here, as quoted at length above, Defendants have provided detailed, uncontroverted evidence regarding the compelling government security interest the underlying policy serves. *See Decl. of Machin* [#60-5] ¶ 18; *Decl. of Trani* [#60-2] ¶¶ 13-28. In his Response, Plaintiff conclusorily states that "[t]he fedora requested by [him] is a different hat, just like the Muslims have with a Turban, or different clothes like medical shoes, gold T-shirts for the transgender women at ACC, State boots versus Canteen boots etc. All these variances have been allowed." *See* [#63] at 6; *see also id.* at 3 ("The CDOC allows the Muslims a Turban, not just a Kufi. They now have Transgender inmates who have different colored T-Shirts, Bras and panties. They can also buy Make-up, curling irons, nail polish etc."). However, he has not provided any evidence to this effect, such as an affidavit or sworn declaration either from himself or from any other inmates or facility personnel. Thus, there is no genuine issue of material fact regarding whether the government has demonstrated that its policy is in the furtherance of a compelling government interest. *See Robertson v. McCullough*, 739 F. App'x 932, 936 (10th Cir. 2018) (quoting 42 U.S.C. § 2000cc-1).

Finally, the government must show that the substantial burden is the result of "the least restrictive means of furthering that compelling governmental interest," 42 U.S.C. § 2000cc-1(a)(2). "[T]he government must present evidence that imposing a substantial burden on an inmate's sincerely held religious beliefs . . . does so by the least restrictive means." *Reed*, 719 F. App'x at 779 (citing *Abdulhaseeb*, 600 F.3d at 1318-19). "[A]s part of its burden to show that its policy represents the least restrictive means available to further its putatively compelling interest, the government must of course 'refute . . .

alternative schemes' suggested by the plaintiff to achieve that same interest and show why they are inadequate." *Yellowbear*, 741 F.3d 48, 62-63 (quoting *United States v. Wilgus*, 638 F.3d 1274, 1289 (10th Cir. 2011). Plaintiff has here failed to suggest any alternative schemes, which is therefore fatal to his claim:

> [A] number of courts that have considered the least restrictive means question in the context of incarcerated worshippers have held that the government should not be required to refute every conceivable option . . . . Thus the government's burden is two-fold: it must support its choice of regulation, and it must refute the alternative schemes offered by the challenger, but it must do both through the evidence presented in the record.
>
> . . . The task of deciding whether a particular regulatory framework is the least restrictive—out of all conceivable—means of achieving a goal virtually begs a judge to go on a fishing expedition in his or her own mind without tethering the inquiry to the evidence in the record. It is incumbent upon us, therefore, to limit ourselves to consideration of the alternative regulation schemes proffered by the parties, and supported in the record. A statute that asks whether a regulation is the least restrictive means of achieving an end is not an open-ended invitation to the judicial imagination.

*Wilgus*, 638 F.3d at 1289 (internal citations and quotation marks omitted).

Although the Court could imagine possible alternatives to a complete ban on the fedora, such as, for example, allowing Plaintiff to wear the fedora in his cell, or allowing Plaintiff to wear the fedora only when he is otherwise engaged in religious activity, the law does not permit such an open-ended analysis. In the absence of an alternative *suggested by the parties*, the Court finds that summary judgment in favor of Defendants is appropriate.

Accordingly, the Court **recommends** that summary judgment be entered in favor of Defendants in their official capacities on the portion of Plaintiff's RLUIPA claim seeking injunctive relief regarding a fedora/black hat.

**3.     Candles**

The Court has already recited the majority of evidence presented by the parties regarding candles and will not here recite that evidence in full again. *See supra § III.B.2.a.* The only remaining issue to be addressed is whether the occasional substitution of an electric tea light candle in place of a burning wax candle violates Plaintiff's rights under RLUIPA. Plaintiff describes the issue as follows:

> . . . CDOC is now saying they are of the opinion that using "battery operated tea lights" will serve the same purpose [as burning candles] for being able to do this [lighting ceremony] at the correct time. My problem with this is many fold: 1) [T]he blessing for the Friday candle lighting is translated "igniting the candle for Sabbath." 2) [T]he lighting for the Havdolah (Saturday) is "create the lights of fire." 3) [T]here is no place in the Torah or Tenach that ever states you should "flip the switch" instead of lighting the candles." 4) Judaism is steeped in <u>traditions</u> and if we start to forgo these traditions we start to lose our Jewish identities. This is a very clearly established religious practice, and I do admit some do choose to use the modern electric devices for this purpose. This, however, does not meet my religious practices or beliefs. . . . [I]t is my firm religious belief and practice that we are to follow the traditional rules and Code of Jewish Law rather than lenient or loose translations of these traditions . . . .

*Am. Compl.* [#12] at 5. Plaintiff concedes that inmates can have wax candles but asserts that Defendant Olguin has instructed him that he must use electric tea light candles sometimes if he expects to light the candles at the correct times always. *Id.*

Defendants present evidence that "[t]he facility cannot always allow Mr. Mounts to burn a real candle at the necessary time, for example if a lockdown occurs after a violent or dangerous incident, but he also has tea lights which are commonly used in lieu of wax candles." *Decl. of Machin* [#60-5] ¶ 13. Plaintiff states that, "for instance, Chanukah Friday night last December [2017] (Jewish month of Kislev) we were told to simply light an electric candle at the correct time on Friday ([c]orrect time was at around 4:20pm) when this holiday mandates a "Real" candle, not a light bulb. [W]e weren't allowed to perform a

proper candle lighting." *Pl.'s Interrogatory Responses* [#49] at 6. Plaintiff does not provide additional information about this incident, such as whether a lockdown or other prison occurrence was happening, and he has not provided information regarding how often he has been forced to light an electric tea light rather than burning a wax candle.

The evidence and arguments before the Court present a moving target regarding the use of electric tea lights. First, Plaintiff concedes that he is not seeking to have candle lightings during a Count, and that instead, when the correct candle lighting time has fallen during a count time, he has asked to either light a burning candle earlier (on Fridays) or later (on Saturdays). *Response* [#63] at 2. In other words, when faced with this choice, it appears more important to Plaintiff to light a burning candle than to have the service at the correct time. Second, incorporating the Court's discussion above regarding candle-lighting times, *see supra § III.B.2.a.*, it appears that the issue of timing of services is now prudentially moot and should also take care of the vast majority of times when Plaintiff has been required to light an electric tea light instead of a burning candle. Third, there still may well be times when Plaintiff cannot be accommodated to light a burning candle, either during open program hours or with a special after-hours escort, such as when a lockdown is in effect at the facility or when other security needs mean an extra officer is not available to escort Plaintiff. *Decl. of Machin* [#60-5] ¶ 13; *Decl. of Green* [#60-6] ¶ 2. However, Plaintiff has not asserted that he should be permitted to light a burning candle when the facility is on lockdown, although his only alternative during such an event would seem to be to light an electric tea candle. Fourth, it would appear from the totality of the circumstances that at least some prison staff have been under the impression that use of an electric tea candle is a suitable *equal* alternative to a burning wax candle rather than a

-40-

least restrictive means of furthering the policy that tea lights may be used only when the option of lighting wax candles is not available. *See Pl.'s Interrogatory Responses* [#49] at 6; *Am. Compl.* [#12] at 5.

As the situation now stands based on the evidence before the Court, the tea candle alternative does not appear to be an extraordinary burden on Plaintiff's practice of religion. Nevertheless, the Court assumes that this burden may still be a "substantial" burden on an inmate's religious practices under RLUIPA, because the government is here, at least occasionally, preventing "participation in conduct motivated by a sincerely held religious belief," i.e., the lighting of a wax candle at certain days and times of the week. *See Abdulhaseeb*, 600 F.3d at 1315.

Next, the Court finds that the government has shown that it has a compelling governmental interest in prohibiting Plaintiff from lighting a wax candle in his cell at certain times due to security concerns relating to count and lockdown, among other things. *See, e.g.*, *Decl. of Machin* [#60-5] ¶ 13; *Abdulhaseeb*, 600 F.3d at 1318-19.

Thus, the Court turns to the question of whether the government's compelling interest is met by the least restrictive means. To the extent Plaintiff may be asserting that electric tea lights are *never* a suitable alternative, he does not provide evidence to that effect. In fact, the Court especially takes note of a prior lawsuit filed by Plaintiff, Civil Action No. 99-cv-01167-LTB, in which Judge Babcock approvingly stated on this issue:

> Adhering to this commencement time [for a candle-lighting service] can be difficult, however, due to unavoidable aspects of operating a prison, such as lockdowns and counts. Amended AR 800-01 permits inmates to purchase and use battery powered tea lights and authorizes their use in inmates' cells, thereby ensuring (to the greatest extent possible, given the context) that inmates will be able to punctually and properly participate in this service.

*Ex. K* [#70-2] at 4.

However, Plaintiff does provide an alternative suggestion, i.e., that he be permitted to light a candle at incorrect times that are either later or earlier than the actual time he should be lighting a candle according to his faith. *Response* [#63] at 2. Although the Court has found that Plaintiff's claim regarding permission to light candles at the appropriate service times is prudentially moot, the alternative here which has not yet been addressed is for Plaintiff to light candles at the incorrect times, i.e., earlier on Fridays or later on Saturdays. As noted above, when faced with this choice, it appears more important to Plaintiff to light a burning candle than to have the service at the correct time. In other words, he suggests this alternative as a way to minimize his need to use electric tea lights. Although the government has agreed to accommodate Plaintiff's requests for candle-lightings at the appropriate service times, it is unclear from this record whether that accommodation would extend to allowing Plaintiff to light candles at times other than those required by his Jewish faith.

The government has not refuted this alternative scheme suggested by Plaintiff, perhaps for the reason that the scheme was more of an allusion than a direct statement by Plaintiff. Nevertheless, construing Plaintiff's pleadings liberally, as the Court must, the Court finds that Plaintiff has adequately stated this alternative, and that Defendants have failed to address it. In light of Defendants' failure to demonstrate that there is no genuine issue of material fact on this point, the Court cannot find that its policy is the least restrictive means of furthering the government's compelling interests. *See, e.g.*, *Jenner*, 2012 WL 1319783, at *4.

Accordingly, the Court **recommends** that the Motion [#60] be **denied** to the extent

Defendants in their official capacities seek entry of summary judgment in their favor on the portion of Plaintiff's RLUIPA claim regarding tea lights and injunctive relief.

### E.      First Amendment

#### 1.      Injunctive Relief

##### a.      Official Capacity

The Court first addresses Plaintiff's First Amendment claim to the extent he seeks injunctive relief against Defendants in their official capacities.   A plaintiff must first provide evidence demonstrating that a sincerely-held religious belief has been substantially burdened.   *Kay*, 500 F.3d at 1218.   The government must then "identify the legitimate penological interests that justified the impinging conduct" before turning to *Turner v. Safley*, 482 U.S. 78, 89-91, to examine certain factors in order to determine the reasonableness of the regulation at issue.   *Kay*, 500 F.3d at 1218-19 (internal alterations omitted).

Defendants argue that Plaintiff has failed to meet the "substantial burden" standard here.   *Motion* [#60] at 11-13.   Courts have emphasized that "the standards under RLUIPA are different than under the free exercise clause of the First Amendment."   *Kay*, 500 F.3d at 1221; *see also Abdulhaseeb*, 600 F.3d at 1314 (same).   For example, showing a "substantial burden" on one's religion under the First Amendment requires meeting a more stringent standard than under RLUIPA.   *See, e.g.*, *Abdulhaseeb*, 600 F.3d at 1315 (stating in part that a substantial burden occurs under RLUIPA where a prison official merely "prevents participation in conduct motivated by a sincerely held religious belief").   Under the First Amendment, a substantial burden is one that "(1) significantly inhibits or constrains a plaintiff's religious conduct or expression, (2) meaningfully curtails a plaintiff's ability to

express adherence to his faith, or (3) denies the plaintiff reasonable opportunity to engage in fundamental religious activities." *Mares v. LePage*, No. 16-cv-03082-RBJ-NYW, 2018 WL 1312814, at *3 (D. Colo. Mar. 13, 2018).

In *Mares v. LePage*, 2018 WL 1312814, at *2, an inmate asserted a claim under the First Amendment based on (1) a prison official refusing to formally change his religious designation to Judaism, thereby preventing him from receiving kosher meals, (2) the failure to provide him with a Torah, and (3) the failure to get a rabbi to visit the inmate's detention center. Although the Court found that the plaintiff-inmate had sufficiently shown he had a sincerely-held belief, the Court found that he had not adequately demonstrated that his religious beliefs were substantially burdened and, if so, how. *Mares*, 2018 WL 1312814, at *3. First, the Court noted, "with regard to the kosher diet, [the plaintiff] makes no argument that his beliefs preclude him from eating a non-kosher diet and fails to otherwise show how eating a non-kosher diet 'significantly inhibits or constrains' his religious conduct or expression." *Id.* Second, the Court stated, "regarding the personal Torah and visiting rabbi[,] . . . [h]e did not assert that these denials left him without access to any religious materials, nor that he was precluded from contacting a rabbi himself to seek spiritual guidance." *Id.*

Similarly to the *Mares* case, Plaintiff here has "provided a list of items that he felt were wrongfully denied him in violation of his religious beliefs," but "he failed to take the extra step of explaining why or how these denials substantially burdened his ability to practice his Jewish faith," at least with respect to his fedora and Tefillin requests. *See id.* Thus, although the denial of these two religious-based requests may be "disappointing" to Plaintiff, he has not provided evidence demonstrating "whether and how these denials

-44-

constituted a substantial burden on his ability to exercise his Jewish faith." *See id.* The Court therefore finds that Plaintiff has failed to demonstrate a genuine issue of material fact with respect to his First Amendment claim regarding a fedora and Tefillin.

However, the Court reaches a different conclusion regarding the issue of Plaintiff's candle-lighting. To reiterate, Plaintiff has stated:

> My problem with this is many fold: 1) [T]he blessing for the Friday candle lighting is translated "igniting the candle for Sabbath." 2) [T]he lighting for the Havdolah (Saturday) is "create the lights of fire." 3) [T]here is no place in the Torah or Tenach that ever states you should "flip the switch" instead of lighting the candles." 4) Judaism is steeped in traditions and if we start to forgo these traditions we start to lose our Jewish identities. This is a very clearly established religious practice, and I do admit some do choose to use the modern electric devices for this purpose. This, however, does not meet my religious practices or beliefs. . . . [I]t is my firm religious belief and practice that we are to follow the traditional rules and Code of Jewish Law rather than lenient or loose translations of these traditions . . . .

*Am. Compl.* [#12] at 5. The Court finds that this evidence is sufficient to create an issue of fact regarding a substantial burden on the free exercise of Plaintiff's religion under the First Amendment by, at a minimum, significantly inhibiting Plaintiff's religious conduct/expression. *See Mares*, 2018 WL 1312814, at *3.

Under the First Amendment, the government next needs to "identify the legitimate penological interests that justified the impinging conduct" and then examine the factors under *Turner v. Safley*, 482 U.S. 78, 89-91, to determine the reasonableness of the regulation at issue. *Kay*, 500 F.3d at 1218-19 (internal alterations omitted). Even assuming that Defendants have sufficiently identified the "legitimate penological interest" portion of the First Amendment test (which essentially boils down to security concerns), they provide no meaningful analysis of the *Turner* factors—in fact, they do not even mention *Turner* or its four factors in either their Motion [#60] or their Reply [#70]. Thus the

Court is left with no real guidance in evaluating this portion of the merits of their Motion [#60] and would, in essence, have to sift through the evidence and make their argument for them. This task it will not do. *See, e.g.*, *Perry v. Woodward*, 199 F.3d 1126, 1141 n.13 (10th Cir. 1999) ("This court . . . will not craft a party's arguments for him."). Application of the *Turner* factors in these types of cases is hardly a mystery, and it is unclear to the Court why the parties chose not to address them. *See, e.g.*, *Al-Owhali v. Holder*, 687 F.3d 1236, 1240 (10th Cir. 2012) ("Analysis of the four *Turner* factors is necessary at the summary judgment stage."). Given that Defendants have the burden to first provide sufficient justification for the interests they have advanced in support of their actions in order to bring those actions within *Turner*'s scope, *see Beard v. Banks*, 548 U.S. 521, 533 (2006), the Court finds that Defendants have failed to demonstrate that there is no genuine issue of material fact here and that they are entitled to judgment as a matter of law. *See, e.g.*, *Hoeck v. Miklich*, No. 13-cv-00206-PAB-KLM, 2015 WL 13730079, at *7 (D. Colo. Oct. 26, 2015).

Accordingly, the Court **recommends** that summary judgment enter in favor of Defendants in their official capacities with respect to the portions of Plaintiff's First Amendment claim regarding injunctive relief sought in connection with a fedora and Tefillin. The Court further **recommends** that the Motion [#60] be **denied** with respect to the portion of Plaintiff's First Amendment claim regarding injunctive relief sought in connection with wax candles to the extent asserted against Defendants in their official capacities.

### b.    Individual Capacity

It is unclear whether Plaintiff is asserting a request for injunctive relief against

Defendants in their individual capacities under the First Amendment. To the extent that he is, "Section 1983 plaintiffs may sue individual-capacity defendants only for money damages." *Brown v. Montoya*, 662 F.3d 1152, 1161 n.5 (10th Cir. 2011) (citing *Hafer v. Melo*, 502 U.S. 21, 27 (1991)). Thus, any individual capacity claims for injunctive relief under Plaintiff's First Amendment claim are barred. *See, e.g.*, *Tenison v. Byrd*, No. CIV-17-1265-C, 2018 WL 7108071, at *4 (W.D. Okla. Dec. 28, 2018).

Accordingly, the Court **recommends** that summary judgment enter in favor of Defendants in their individual capacities with respect to the portions of Plaintiff's First Amendment claim which may be seeking injunctive relief.

### 2.    Monetary Relief

Defendants argue that they are entitled to qualified immunity on Plaintiff's First Amendment claims.[11] *Motion* [#60] at 7-8, 17-18; *Reply* [#70] at 3-4. The doctrine of qualified immunity "shields government officials performing discretionary functions from liability 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Boles v. Neet*, 486 F.3d 1177, 1180 (10th Cir. 2007) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity only applies to claims seeking individual capacity liability for civil damages. *Harlow*, 457 U.S. at 818.

When a defendant raises qualified immunity on summary judgment, the burden

---

[11] Plaintiff expresses uncertainty about whether all of his requests or only the candle claim should fall under the First Amendment. *See Response* [#63] at 5 ("The rest of the items [beyond the candles] . . . may only fall under RLUIPA . . . ."). In the interest of completeness, the Court addresses the Tefillin, fedora, burning-versus-electric candles, dreidel, gartel, candle-lighting times, and two-month denial of religious services complaints here to the extent Plaintiff may be seeking damages from Defendants in their individual capacities.

shifts to the plaintiff to satisfy a strict two-part test. *Nelson v. McMullen*, 207 F.3d 1202, 1206 (10th Cir. 2000). First, taking the facts in a light most favorable to the plaintiff, the plaintiff must provide evidence demonstrating that each defendant's actions violated a constitutional or statutory right. *Id.* Second, the plaintiff has the burden of showing that "the constitutional or statutory rights the defendant allegedly violated were clearly established at the time of the conduct at issue." *Id.* (quoting *Albright v. Rodriguez*, 51 F.3d 1531, 1534-35 (10th Cir. 1995) (citations omitted)). If the plaintiff does not meet his burden of demonstrating both of these elements, then the defendant is entitled to qualified immunity. *Nelson*, 207 F.3d at 1206.

"Ordinarily, a plaintiff may show that a particular right was clearly established at the time of the challenged conduct by identifying an on-point Supreme Court or published Tenth Circuit decision; alternatively, the clearly established weight of authority from other courts must have found the law to be as he maintains." *A.M. v. Holmes*, 830 F.3d 1123, 1135 (10th Cir. 2016) (internal quotation marks and alterations omitted). "However, we do not always require case law on point, and the Supreme Court has warned that officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Id.* (internal quotation marks and citations omitted). "We have therefore adopted a sliding scale to determine when law is clearly established." *Id.* "The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation." *Id.* at 1135-36. It is not necessary to show that "the very action in question has previously been held unlawful, [but] in the light of pre-existing law the unlawfulness must be apparent." *Id.* at 1136 (internal alterations and quotation marks omitted).

Recently, in *Ali v. Duboise*, 763 F. App'x 645, 649-50 (10th Cir. 2019), the Tenth Circuit Court of Appeals addressed the issue of qualified immunity and "clearly established law" in the context of a First Amendment free-exercise claim in which a jail official-defendant purportedly told the inmate-plaintiff "to pray outside his cell" and then responded "to his request for a more specific location to pray with threats, expletives, a 'push,' and a temporary lock down." While the Tenth Circuit did not necessarily say anything new, it did essentially affirm that the "clearly established" law in this area is the same as for other constitutional claims. Affirming the district court's determination that the law was not clearly established (and therefore that the jail official-defendant was entitled to qualified immunity), the Tenth Circuit emphasized that "clearly established law should not be defined at a high level of generality" but must be "particularized to the facts of the case." *Ali*, 763 F. App'x at 650 (quoting *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (per curiam) (internal quotation marks omitted)). The Tenth Circuit also emphasized that "[a]lthough a plaintiff need not identify a case directly on point, existing precedent must have placed the statutory or constitutional question beyond debate." *Ali*, 763 F. App'x at 650 (internal quotation marks and ellipsis omitted) (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam)).

### a.    Requests for Religious Items

Regarding the storage location of Tefillin, even if a First Amendment violation were found, the Court has found no Supreme Court, Tenth Circuit Court of Appeals, or other Court of Appeals case which clearly establishes a constitutional violation on facts even remotely similar to Defendants' alleged conduct. Further, the Court has found no indication that it was otherwise "obvious" from pre-existing case law establishing the contours of the First Amendment free-exercise right that Defendants' actions would violate Plaintiff's rights

on this issue. *See White*, 137 S. Ct. at 552. Accordingly, the Court finds that Defendants in their individual capacities are entitled to qualified immunity on Plaintiff's First Amendment claim regarding Tefillin.

Similarly, regarding a fedora/black hat, even if a First Amendment violation were found, the Court has found no Supreme Court, Tenth Circuit Court of Appeals, or other Court of Appeals case which clearly establishes a constitutional violation on facts even remotely similar to Defendants' alleged conduct, i.e., preventing Plaintiff from owning/wearing one. Further, the Court has found no indication that it was otherwise "obvious" from pre-existing case law establishing the contours of the First Amendment free-exercise right that Defendants' actions would violate Plaintiff's rights on this issue. *See White*, 137 S. Ct. at 552. Accordingly, the Court finds that Defendants in their individual capacities are entitled to qualified immunity on Plaintiff's First Amendment claim regarding a fedora.

The same is true of Plaintiff's claim regarding whether electric tea lights are suitable, occasional alternatives to burning candles. The Court has found no Supreme Court, Tenth Circuit Court of Appeals, or other Court of Appeals case which clearly establishes a constitutional violation on facts even remotely similar to Defendants' alleged conduct, i.e., requiring Plaintiff to use electric tea lights on occasion. Further, the Court has found no indication that it was otherwise "obvious" from pre-existing case law establishing the contours of the First Amendment free-exercise right that Defendants' actions would violate Plaintiff's rights on this issue. *See White*, 137 S. Ct. at 552. Accordingly, the Court finds that Defendants in their individual capacities are entitled to qualified immunity on Plaintiff's First Amendment claim regarding electric tea lights.

Again, the same is true of Plaintiff's claim regarding access to a dreidel (a situation which has now been remedied, as discussed in Section III.B.2.b.). The Court has found no Supreme Court, Tenth Circuit Court of Appeals, or other Court of Appeals case which clearly establishes a constitutional violation on facts even remotely similar to Defendants' alleged conduct, i.e., preventing Plaintiff from having access to a dreidel. Further, the Court has found no indication that it was otherwise "obvious" from pre-existing case law establishing the contours of the First Amendment free-exercise right that Defendants' actions would violate Plaintiff's rights on this issue. *See White*, 137 S. Ct. at 552. Accordingly, the Court finds that Defendants in their individual capacities are entitled to qualified immunity on Plaintiff's First Amendment claim for monetary damages regarding access to a dreidel.

Finally, the same is true of Plaintiff's claim regarding his ability to have a gartel (a situation which has now been remedied, as discussed in Section III.B.2.c.). The Court has found no Supreme Court, Tenth Circuit Court of Appeals, or other Court of Appeals case which clearly establishes a constitutional violation on facts even remotely similar to Defendants' alleged conduct, i.e., preventing Plaintiff from having a gartel. Further, the Court has found no indication that it was otherwise "obvious" from pre-existing case law establishing the contours of the First Amendment free-exercise right that Defendants' actions would violate Plaintiff's rights on this issue. *See White*, 137 S. Ct. at 552. Accordingly, the Court finds that Defendants in their individual capacities are entitled to qualified immunity for monetary damages on Plaintiff's First Amendment claim regarding his ability to have a gartel.

### b. Timing of Candle Lighting

The Court previously found with respect to injunctive relief that the timing of candle lighting is prudentially moot. *See supra § III.B.2.a.i.* Regarding qualified immunity and monetary damages, the Court has found no Supreme Court, Tenth Circuit Court of Appeals, or other Court of Appeals case which clearly establishes a constitutional violation on facts even remotely similar to Defendants' alleged conduct, i.e., failure to consistently permit the timely lighting of wax candles when so required by Plaintiff's Jewish faith. Further, the Court has found no indication that it was otherwise "obvious" from pre-existing case law establishing the contours of the First Amendment free-exercise right that Defendants' actions would violate Plaintiff's rights on this issue. *See White*, 137 S. Ct. at 552. Accordingly, the Court finds that Defendants in their individual capacities are entitled to qualified immunity on Plaintiff's First Amendment claim regarding the timing of candle lighting.

### c. Denial of Religious Services

Finally, the Court addresses Plaintiff's claim regarding denial of religious services. Plaintiff asserts that in May 2016 Defendant Olguin denied Plaintiff any religious services for a period of two months. *Am. Compl.* [#12] at 7. Plaintiff asserts that this denial violated CDOC AR 150-01, although he does not specify which part of this 25-page regulation was violated. *Id.* At the outset, the Court notes that "a failure to adhere to administrative regulations does not [automatically] equate to a constitutional violation." *Hovater v. Robinson*, 1 F.3d 1063, 1068 n.4 (10th Cir. 1993). Plaintiff cites to *Greene v. Solant County Jail*, 513 F.3d 982, 988 (9th Cir. 2008), for the proposition that the "jail's policy of prohibiting . . . a maximum security prisoner[ ] from attending group religious worship services substantially burdened his ability to exercise his religion." *Response* [#63] at 6.

However, this case is distinguishable on the basis that (1) this discussion occurred in the context of a RLUIPA claim, and not regarding a First Amendment claim, and, perhaps more importantly, (2) the case concerned a permanent, "total ban on group religious worship by maximum security prisoners," rather than a temporary ban based on the prison's internal penal code, as is the situation here. *See Greene*, 513 F.3d at 989.

Defendants present the following uncontested evidence on this issue. *Motion* [#60] at 5-6.

> In June 2016 it was determined that Mr. Mounts would be administratively prohibited from attending services in the programs area for 60 days. The decision was made after consultation with headquarters regarding incidents of theft from the program area. Mr. Mounts had twice previously been caught stealing or possessing items stolen from the GED room, which is in the same area as programs. I tried to find a different area to hold Jewish services, but the facility could not accommodate such a move. The DOC decided to prohibit Mr. Mounts from being in the programs area as an administrative consequence to his violations of DOC rules.

> I explained to Mr. Mounts that he would be temporarily prohibited from attending services within the program area, but he would be allowed to practice in his cell.

> These incidents were problematic for the programs area, but also create broader security concerns. Some offenders are used to transport items for others. Often, offenders will conceal items in common areas, where many offenders may access the item. This way, an item can be concealed by one offender and retrieved by another offender. Mr. Mounts' involvement in two theft incidents creates a specific concern that he might be compromised or be subject to pressure from other offenders to transport items. Particularly because he has a wheelchair that can be used to conceal items. Although Mr. Mounts' behavior certainly raises concerns, I gave Mr. Mounts the benefit of the doubt and restored his access to the programs area after the 60-days passed.

*Decl. of Olguin* [#60-3] ¶¶ 7-9 (internal citations omitted) (citing *Attach. 1, Theft Reports* [#60-3] at 7-10; *Attach. 2, Memo Regarding 60-day-Ban* [#60-3] at 11).

The Court has found no Supreme Court, Tenth Circuit Court of Appeals, or other

Court of Appeals case which clearly establishes a constitutional violation under the First Amendment on facts even remotely similar to Defendants' alleged conduct, i.e., preventing an inmate from attending religious services for a finite period based on purported issues of theft from the area where religious services are held, especially where the inmate was permitted to practice within his cell to the best of his ability during that period. Further, the Court has found no indication that it was otherwise "obvious" from pre-existing case law establishing the contours of the First Amendment free-exercise right that Defendants' actions would violate Plaintiff's rights on this issue. *See White*, 137 S. Ct. at 552. Accordingly, the Court finds that Defendants in their individual capacities are entitled to qualified immunity on Plaintiff's First Amendment claim regarding the temporary denial of religious services.

Accordingly, the Court **recommends** that summary judgment enter in favor of Defendants on all of Plaintiff's First Amendment claims to the extent they are asserted against Defendants in their individual capacities.

## IV. Conclusion

For the foregoing reasons, the Court respectfully **RECOMMENDS** that the Motion [#60] be **GRANTED in part and DENIED in part**, as outlined above.[12]

IT IS HEREBY **ORDERED** that pursuant to Fed. R. Civ. P. 72, the parties shall have fourteen (14) days after service of this Recommendation to serve and file any written

---

[12] If this Recommendation is adopted in full, the remaining claims will be (1) Plaintiff's Fourteenth Amendment due process claim seeking damages against Defendant Olguin in his individual capacity; (2) Plaintiff's RLUIPA claim seeking injunctive relief against Defendants in their official capacities regarding wax candles/tea lights; and (3) Plaintiff's First Amendment claim seeking injunctive relief against Defendants in their official capacities regarding the use of electric tea lights/wax candles.

objections in order to obtain reconsideration by the District Judge to whom this case is assigned. A party's failure to serve and file specific, written objections waives de novo review of the Recommendation by the District Judge, Fed. R. Civ. P. 72(b); *Thomas v. Arn*, 474 U.S. 140, 147-48 (1985), and also waives appellate review of both factual and legal questions. *Makin v. Colo. Dep't of Corr.*, 183 F.3d 1205, 1210 (10th Cir. 1999); *Talley v. Hesse*, 91 F.3d 1411, 1412-13 (10th Cir. 1996). A party's objections to this Recommendation must be both timely and specific to preserve an issue for de novo review by the District Court or for appellate review. *United States v. One Parcel of Real Prop.*, 73 F.3d 1057, 1060 (10th Cir. 1996).

Dated: July 10, 2019

BY THE COURT:

Kristen L. Mix
United States Magistrate Judge